**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| SALVATORE PELULLO,<br><br>Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | Civil Action No. 24-4008 (MAS)<br><br>**OPINION** |

**SHIPP, District Judge**

This matter comes before the Court on Petitioner Salvatore Pellulo's ("Petitioner" or "Pelullo") motion to vacate sentence brought pursuant to 28 U.S.C. § 2255. (ECF Nos. 1, 18.) Following an order to answer, the Government filed a response to Petitioner's motion (ECF No. 24), to which Petitioner replied (ECF No. 25). For the following reasons, this Court will deny Petitioner's motion to vacate and supplemental motion to vacate sentence, and will deny Petitioner a certificate of appealability.

## I. BACKGROUND

In its opinion affirming Petitioner's conviction, the Third Circuit described the facts underlying this matter follows:

> This case has its roots in organized crime, and, like other mob cases, it gets its start with family – both biological and made. Nicodemo Domenico "Little Nicky" Scarfo Sr. was the "boss" of the Philadelphia branch, or "family," of La Cosa Nostra ("LCN") for most of the 1980s. He oversaw nearly a decade of murders, gambling, and extortion for the benefit of LCN.

By the time [Petitioner and his co-defendants] here began their FirstPlus scheme, however, he was out of the game, serving a lengthy prison sentence[.] His son, Nicodemo Salvatore "Nicky" Scarfo[,] wanted to fill the power vacuum, but his attempted takeover of the Philadelphia LCN family did not go according to plan. On Halloween 1989, as he was having dinner at a restaurant, masked assailants ambushed him, shooting him several times but, no doubt to their chagrin, not killing him.

When he recovered, Scarfo sought the help of the Lucchese LCN family, which operated in northern New Jersey. He had an "in" with the Luccheses: their boss was incarcerated in the same prison as his father. According to the government's expert on the structure and operations of LCN, eventually the Lucchese family integrated Scarfo into their organizations as a "made member" – someone who has been "fully inducted" and has "taken an oath of loyalty to the family." Being a made member meant that he had to generate money for the Lucchese family and share with it the profits of any criminal activities he pursued.

Scarfo's longtime friend [Petitioner] Salvatore Pelullo, although not a blood relative, had a close relationship not only with Scarfo but with Scarfo's father[,] too. The older Scarfo treated Pelullo as his nephew. Pelullo became an "associate" of the Luccheses – a criminal colleague who hadn't been "formally initiated into [the family's] ranks." The government's expert testified that an associate like Pelullo had to "share . . . the profits of any of [his] criminal activity" with the family, and he had to answer to a made member, such as Scarfo, who would "supervis[e] and direct[]" any of his actions.

Before the events at issue in this case, Scarfo and Pelullo had each earned criminal convictions. Scarfo was convicted in 1990 of assaulting a woman in a hospital elevator, and then in 1993 for racketeering conduct. In 2002, he was convicted of running an illegal gambling business. Pelullo, meanwhile, was convicted of bank fraud and making false statements to the SEC in 1999. Three years later, he pled guilty to wire fraud.

. . . .

In 2007, Scarfo and Pelullo stumbled on "the golden vein of delas" – an opportunity that seemed so lucrative, they thought they could ride it into retirement. That opportunity was FirstPlus, a Texas-based mortgage company whose main operating subsidiary had recently exited bankruptcy after falling on hard times. Following that restructuring, FirstPlus began receiving periodic,

multi-million-dollar "waterfall" payments from its bankruptcy trust.[] At that point, it was essentially a dormant parent company receiving the waterfall payments but doing no business.

After the payments started coming in, a former FirstPlus employee, Jack Roubinek, had the idea to locate investors and gain control of FirstPlus. In early 2007, he contacted his attorney, William Maxwell, and asked him to research the possibility of investing in FirstPlus. At around the same time, Pelullo learned about FirstPlus from his business acquaintance David Roberts, a mortgage broker from Staten Island. A group including Pelullo, Roberts, Scarfo, Roubinek, and Gary McCarthy (Pelullo's attorney and eventual codefendant) gathered in Philadelphia to discuss a potential takeover of FirstPlus.

At first, according to Roberts, their thinking was "to try to raise money to buy [FirstPlus's] stock[.]" That plan, however, fell through: the group realized that none of them had the money needed to buy the stock. Luckily for them, however, FirstPlus had recently fired Jack Draper, a high-ranking employee. Draper had griped about his firing to Roubinek – the two having become acquainted while employed at FirstPlus – and to William Maxwell.[] Those three were joined by Roberts and Pelullo for a meeting in Dallas, where Draper, bearing a grudge, told the group he was willing to "divulge all" and accuse the FirstPlus board and CEO Daniel Phillips of financial improprieties.

That "completely changed the direction of the plan." Seeing an opportunity, Pelullo, who was emerging as the leader of the takeover group, worked with William Maxwell to send letters to Phillips and other board members. The letters were purportedly written by Draper and threatened that he would go to "the FBI, the IRS[,] the U.S. Attorney's [O]ffice[,] [FirstPlus's] Bankruptcy's attorney and the SEC" with claims of financial misconduct including bribery, money laundering, and Sarbanes-Oxley violations.[] They also threatened to tell Phillips's wife – who was then divorcing him – that Phillips had raped an assistant and used the company's moneys to pay off the victim when she got pregnant. According to Phillips, all those claims were false, but he was nonetheless concerned that their dissemination would cause grave damage to his and the company's reputations.

The letters had their intended effect. Phillips met with William Maxwell and Pelullo, who indicated the allegations would be dropped if Phillips and the FirstPlus board handed the business over to them. Evidently, it was an offer he couldn't refuse.

Phillips swiftly persuaded the entire board to give up their positions rather than try to engage in what would be a messy and expensive fight with Pelullo's group. Pelullo then selected a new board of directors for FirstPlus: William Handley (a friend of Pelullo's who took over as Chief Financial Officer), John Maxwell (William Maxwell's brother and the titular Chief Executive Officer), Roberts (who became secretary of the company), Harold Garber (Scarfo's father's attorney, who became the new board chairman), and Robert O'Neal (one of William's clients, who later succeeded Garber as chairman).[] The necessary corporate formalities were followed and, on June 7, just four days after sending the threatening letters, Pelullo and his cronies had total control of the company.

. . . .

With FirstPlus in their power, the new officers and directors went to work – making the company work for them. Pelullo, along with William Maxwell, controlled the show. They even obtained stamps of the directors' signatures so they could run the looting scheme without interference.

The board entered into a "legal services agreement" with William, who became FirstPlus's "special counsel." The contract formally granted him significant power within the organization. It purportedly gave him "[a]ll legal authority for any matter involving" FirstPlus; the power to select and retain legal counsel, accountants, and, "in [his] sole discretion," "any and all consulting firms"; and the right to "spend funds, incur legal expenses, and to expend fees in excess of [his] retainer and to seek reimbursement[.]" He could also "restrict disclosure of the information . . . to any person[,]" including the members of the board. For his supposed labors, William made $100,000 a month, plus expenses of up to $30,000.

With that authority, William hired Pelullo as a consultant to FirstPlus, a role that shielded him from public scrutiny. In practice, though, Pelullo was the "de facto president" of the company, according to FirstPlus's public auditor, Anthony Buczek. John Maxwell was named as CEO, but he largely functioned under Pelullo's control.

Using his controlling position at FirstPlus, and with William's help, Pelullo set up several channels through which money flowed out of FirstPlus's accounts and into his and Scarfo's coffers. For one, Pelullo set up a bogus trust that ostensibly had his children as its beneficiaries. In practice, however, according to codefendant Cory Leshner, the trust was "created for the purposes

of owning" Seven Hills Management, LLC, a company with Pelullo's brother-in-law, Alexander Lyubarskiy, listed as its head.[] Lyubarskiy's supposed management of Seven Hills was strictly for show; "[e]verything he did was at the direction of Mr. Pelullo."

William Maxwell, on FirstPlus's behalf, retained Seven Hills to provide FirstPlus with "consulting services." The agreement entrusted Seven Hills (and, through it, Pelullo) with a "litany of duties" that Leshner summarized as "helping run the entire operation" of FirstPlus. Seven Hills was compensated $100,000 each month plus $15,000 in expenses.

Scarfo, meanwhile, profited from FirstPlus as well. Like Pelullo, he set up a trust that was nominally intended to "benefit[] [his] daughter" but in actuality served as a vehicle for his own gain. That trust, in turn, owned Learned Associates of North America, LLC ("LANA"); both entities were run "[o]n paper" by Scarfo's cousin and codefendant John Parisi. That was a ruse to keep Scarfo's name off the books; "[i]n reality," it was Scarfo, not Parisi, who controlled the trust and LANA. LANA enabled Scarfo to get in on the take through a secondary consulting agreement between LANA and Seven Hills. The agreement obliged LANA to perform for FirstPlus "exactly the same" tasks that Seven Hills was already being paid to do, according to an FBI investigator. In practice, LANA performed no work, but the deal entitled LANA (and, through it, Scarfo) to a roughly one-third cut of what Seven Hills was getting from FirstPlus. As the government puts it, those payments were "effectively 'tribute'" to Scarfo.

Those arrangements were all facilitated by William Maxwell, to whose attorney trust account the consulting fees and expenses were wired. William generally passed those on to Seven Hills, which in turn sent $33,000 a month, plus so called expenses, to LANA. Pelullo was "completely involved with" and oversaw the flow of money from FirstPlus to Maxwell and on to the consulting firms.

Pelullo and Scarfo also profited from FirstPlus by having it acquire three shell companies they owned. First up was Rutgers Investment Group, LLC, an unsuccessful mortgage loan provider majority owned by LANA and Seven Hills. Rutgers's single source of revenue was receivables it supposedly got from Shore Escapes, a defunct vacation sales company also owned by Seven Hills and LANA. It was make-believe money, but on June 7, the new team's first day in office, Pelullo got approval for the acquisition from the FirstPlus board, and the following month FirstPlus bought Rutgers for approximately $1.8 million and 500,000 FirstPlus shares.

Two more acquisitions of companies owned by Seven Hills and LANA followed soon after. FirstPlus bought Globalnet Enterprises, LLC, a financially struggling cleaning company, for around $4.5 million and more than one million shares of FirstPlus stock. It then paid $725,000 – including $100,000 directly to each of Seven Hills and LANA – to buy The Premier Group, LLC, a company Pelullo set up in May 2007 to hold the assets of a company at least nominally in the business of representing the interests of insurance policyholders.

Pelullo made sure that FirstPlus bought his and Scarfo's companies on preposterously favorable terms. To conduct valuations of the target business, he brought in Kenneth Stein, the head of a business brokerage firm. Stein told Pelullo that [Stein] was unqualified to perform the valuations, but Pelullo said to "[j]ust get it done[.]" Though Stein believed the companies' financials were "horrific" and "atrocious," Pelullo pressured him into preparing nominally "independent" valuation reports that overvalued the businesses. William Maxwell covered up Pelullo's involvement by listing his own name on the engagement letters and handling Stein's payments.

Also helping grease the skids were two of Pelullo's attorneys – David Adler and Gary McCarthy. Although FirstPlus's public filings said that the acquisitions were "completed on an arms-length basis" that was not even remotely true. Pelullo had his lawyers on both sides of the negotiating table, with Adler representing FirstPlus and McCarthy representing the shell companies.

In the meantime, Scarfo, Pelullo, and William Maxwell began to take advantage of their ill-gotten gains. Scarfo bought a house and expensive jewelry for his wife; Pelullo purchased a Bentley automobile; Scarfo and Pelullo together bought a yacht; and William and Pelullo had FirstPlus acquire a plane for their personal use. The scheme was working as planned.

Still, the fact that FirstPlus was a public company, with disclosure requirements under federal securities laws, added complications to the looting. To get around those requirements, Pelullo hired Anthony Buczek as FirstPlus's auditor, based on a referral by Howard Drossner, who later became a codefendant. Pelullo pressured Buczek into hiding or obscuring material information about the company – such as the Rutgers and Globalnet acquisitions, the consulting agreements, and Pelullo's prior federal fraud convictions[] – even though FirstPlus was required to disclose that information in its SEC filings.

. . . .

The party had to come to an end, and eventually the actions of the FirstPlus thieves caught up with them. While investigating a tip that Scarfo was again trying to gain control of the Philadelphia LCN, the Federal Bureau of Investigation became aware of the mob ties and suspicious circumstances surrounding the resignation and replacement of FirstPlus's former board. As FBI agents dug deeper, they came to believe – rightly – that Pelullo and Scarfo were behind the FirstPlus takeover and would systematically steal from it. They obtained court permission to track the defendants' locations through their cellphones and wiretap their calls over the course of several months. Among the calls the agents picked up were communications between Pelullo and his lawyers (Maxwell, McCarthy, and Donald Manno). To weed out any discussions protected by Pelullo's attorney-client privilege, the government asked the District Court to review in camera the records of wiretaps assembled by a special "filter team" before they were transmitted to prosecutors[] – all, of course, unbeknownst to Pelullo.

The conspirators eventually came to suspect that they were under investigation. For example, while on a long drive from Dallas to deliver a gun to Scarfo's house in New Jersey, John Maxwell suspected that the government had agents following him in a car and in a helicopter.

The government's investigations escalated on May 8, 2008. That day, the FBI executed search warrants at thirteen locations across the country, including FirstPlus's offices in Texas and the defendants' homes, offices, and law firms in Pennsylvania and New Jersey. They also seized the plane, the Bentley, and the yacht, along with guns they found on board the yacht and more guns and ammunition found at Scarfo's and Pelullo's homes and Pelullo's office. It took another three years for the government to obtain an indictment from a grand jury, but that day did arrive. In unpacking the evidence and building their cases, prosecutors set up additional filter teams to review the evidence recovered from McCarthy's and Manno's law offices and to set aside anything that was privileged before turning the rest over to the team handling the prosecution of the defendants.

. . .

When Scarfo, Pelullo, and their co-conspirators took over the company in early June 2007, FirstPlus had almost $10 million in its accounts, and it received a $4.4 million waterfall payment later

> that year. By the following May, when the FBI seized the accounts, there was less than $2,000 left. Between the fraudulent consulting and legal-services agreements channeled through bogus trusts and the acquisitions of virtually worthless companies, the conspirators had bled FirstPlus dry. It soon fell into bankruptcy, leaving its more than 1,200 public stockholders with the company's husk.

*United States v. Scarfo*, 41 F. 4th 136, 157-62 (3d Cir. 2022) (internal citations and record citations omitted).

## II. LEGAL STANDARD

A prisoner in federal custody may file a motion pursuant to 28 U.S.C. § 2255 challenging the validity of his sentence. Section 2255 provides, in relevant part, as follows:

> A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such a sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

28 U.S.C. § 2255. Unless the moving party claims a jurisdictional defect or a constitutional violation, to be entitled to relief the moving party must show that an error of law or fact constitutes "a fundamental defect which inherently results in a complete miscarriage of justice, [or] an omission inconsistent with the rudimentary demands of fair procedure." *United States v. Horsley*, 599 F.2d 1265, 1268 (3d Cir. 1979) (quoting *Hill v. United States*, 368 U.S. 424, 429 (1962)), *cert. denied*, 444 U.S. 865 (1979); *see also Morelli v. United States*, 285 F. Supp. 2d 454, 458-59 (D.N.J. 2003).

## III. DISCUSSION

### A. No evidentiary hearing is necessary in this matter

A district court need not hold an evidentiary hearing on a motion to vacate where "the motion and files and records of the case conclusively show that the prisoner is entitled to no relief."

28 U.S.C. § 2255(b); *United States v. Booth*, 432 F.3d 542, 545-56 (3d Cir. 2005); *United States v. Day*, 969 F.2d 39, 41-42 (3d Cir. 1992). "Where the record, supplemented by the trial judge's personal knowledge, conclusively negates the factual predicates asserted by the petitioner or indicate[s] that petitioner is not entitled to relief as a matter of law, no hearing is required." *Judge v. United States*, 119 F. Supp. 3d 270, 280 (D.N.J. 2015); *see also Gov't of V.I. v. Nicholas*, 759 F.2d 1073, 1075 (3d Cir. 1985); *see also United States v. Tuyen Quang Pham*, 587 F. App'x 6, 8 (3d Cir. 2014); *Booth*, 432 F.3d at 546. Because Petitioner's claims are either barred or clearly without merit for the reasons discussed herein, the Court need not hold an evidentiary hearing in this matter.

**B. Petitioner's Second Amendment challenges are barred by the Concurrent Sentence Doctrine and Petitioner did not suffer undue spillover prejudice**

In his motion to vacate sentence, Petitioner chiefly argues that his convictions for providing firearms to a convicted felon in violation of 18 U.S.C. 922(d)(1) and possession of a firearm by a felon in violation of 18 U.S.C. § 922(g)(1) are unconstitutional in light of the Supreme Court's decision in *New York Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1 (2022), and the Third Circuit's decisions in *Range v. Attorney General*, 69 F.4th 96 (2023), *judgment vacated sub nom.*, *Garland v. Range*, --- U.S. ---, 144 S. Ct. 2706 (2024), and *Range v. Attorney General (Range II)*, 124 F.4th 218 (2024). In essence, Petitioner argues that because his felony convictions and those of his co-defendant Scarfo were not sufficiently violent felonies to warrant their lifelong disarmament, the relevant statutes are thus unconstitutional as applied to Petitioner and his co-defendant, and Petitioner's convictions under those statutes therefore cannot stand.

In *Bruen*, the Supreme Court clarified the standard applicable to challenges to the constitutionality of statutes which are alleged to violate the Second Amendment. In dealing with such challenges, courts must first determine "whether the text of the Second Amendment applies

to a person and his proposed conduct." If it does, the government "must affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms," chiefly by considering statutes and regulations in effect at or near the founding of the United States. *Bruen*, 597 U.S. at 19, 31-33. Following the remand of its original decision in *Range*, the Third Circuit applied this framework to an as applied challenge to § 922(g) brought by a person with a single welfare fraud conviction in *Range v. Attorney General (Range II)*, 124 F.4th 218 (2024). In that case, the Court of Appeals determined that an individual with only a single, non-violent and relatively minor felony conviction who desired to purchase commonly held firearms for hunting and self defense was among the people protected by the Second Amendment. *Id.* at 228-29. The Third Circuit further held that a complete and lifelong deprivation of the right to purchase and keep commonly held firearms for an individual under those circumstances did not comport with the nation's tradition of firearms regulations and thus was unconstitutional as applied to that individual. *Id.* at 231-32. The Court of Appeals premised this holding in part on the fact that Range had completed all aspects of his criminal sentence, and he had not used a weapon to commit the sentence of conviction. *Id.*

While *Range II* considered only whether the statute was constitutional as applied to an individual with a decades old non-violent, non-weapon conviction who had completed his sentence, that decision left open whether individuals who had completed their custodial sentence but remained on probation or supervised release were also protected by the guarantees of the Second Amendment. The Third Circuit answered that question clearly in the negative in two companion cases: *United States v. Quailes*, 126 F.4th 215 (3d Cir. 2025), and *United States v. Moore*, 111 F.4th 266 (3d Cir. 2025). In those two cases, the Court of Appeals held that individuals who were still serving a probationary, parole, or supervised release term at the time of the challenged conduct could lawfully be prevented from owning or possessing firearms *at least* until

the supervised release or parole term was complete. *Moore*, 126 F.4th at 270-72; *Quailes*, 126 F. 4th at 221-22.

In this matter, Scarfo was on supervised release during the relevant time period when weapons were transferred into his care and custody. Petitioner was clearly aware of this fact insomuch as he was convicted of conspiring to obstruct Scarfo's supervised release in his underlying criminal case. Scarfo, at least, then, had no right to possess the firearms of which Petitioner was convicted of transferring into his custody. *Moore*, 126 F.4th at 270-72; *Quailes*, 126 F.4th at 221-22. Any challenge to Petitioner's convictions, to the extent they rest on his part in the plot to provide firearms to Scarfo, would thus be without merit.

Seemingly recognizing this fact in his reply, Petitioner instead now focuses his argument on the idea that it is impossible to tell from the record whether his § 922(d)(1) and § 922(g)(1) convictions rest on his own possession of firearms, or solely on the basis of the transfer of arms to Scarfo. According to Petitioner, his convictions cannot stand because the Court cannot determine whether those convictions rest on a clearly proper basis—the transfer of arms to Scarfo—or an allegedly improper one—the transfer of arms to Petitioner himself.

Even if Petitioner were correct that the statutes could not be applied to his own possession of firearms without violating the Second Amendment, a point this Court need not and does not reach, this Court need not address Petitioner's argument on the merits because Petitioner received only a concurrent sentence on the challenged counts of his conviction. Petitioner's concurrent 360-month sentence would stand even were those counts to be vacated. Petitioner's claims are therefore barred by the concurrent sentence doctrine. "Under the concurrent sentence doctrine, a court has 'discretion to avoid resolution of legal issues affecting less than all counts in an indictment if at least one will survive and sentences on all counts are concurrent.'" *Parkin*, 565 F. App'x at 152 (quoting *United States v. McKie*, 112 F.3d 626, 628 n.4 (3d Cir. 1997)); *see also*

*Duka v. United States*, 27 F.4th 189, 194-95 (3d Cir. 2022) (extending doctrine to cases involving even a consecutive sentence in a habeas proceeding where victory on the claim asserted would not change the fact or length of the petitioner's sentence in light of an unchallenged life sentence); *Gardner v. Warden Lewisburg USP*, 845 F.3d 99, 104 (3d Cir. 2017).

This doctrine serves as an independent basis for a district court to decline to review a collateral attack so long as success on the claim would not alter the length of the petitioner's detention in light of the concurrently imposed sentences and the petitioner fails to show that there are other unique continuing consequences from the challenged count which would warrant a decision on the merits. *Duka*, 27 F.4th at 195-96. Because a habeas petitioner may not use a collateral challenge to his conviction to attack fines, fees, or special assessments and may instead only challenge the fact or length of his detention, the concurrent sentence doctrine remains applicable to § 2255 claims that challenge a charge for which he received a sentence the same length or shorter than that received on another concurrent sentence. *Id.*

Here, Petitioner's sentence for the weapons charge was made entirely concurrent to the 360-month sentence he otherwise received on the other concurrent counts, including a 360-month concurrent sentence he received on the count of conspiracy to commit bank fraud. (*See* Judgment of Conviction, Docket No. 11-740 at ECF No. 1289.) In the absence of unique continuing consequences, then, Petitioner's Second Amendment challenge falls squarely into the category of challenges this Court must decline to consider under the concurrent sentence doctrine. The Court, therefore, will decline to address these claims on the merits and deny them as barred by the doctrine. *Duka*, 27 F.4th at 195-96.

Seeking to avoid this conclusion, Petitioner also asserts that his convictions on the remaining counts were tainted by the evidence related to the firearms counts at trial, and that he suffered spillover prejudice from that evidence and is therefore entitled to a new trial even on the

non-firearm offenses for which he was convicted. This is not the first time Petitioner has raised a spillover prejudice claim related to the firearms offenses. Petitioner raised a similar claim on direct appeal, which the Court of Appeals rejected, finding that any claim that the firearms evidence caused undue prejudice at trial was "unsupported by the record" and Petitioner's convictions for the RICO, bank, and securities fraud charges "rested on a great deal more evidence than just his involvement with firearms – namely, the extensive testimonial and documentary proof of his leading role in the FirstPlus takeover scheme." *See Scarfo*, 41 F.4th at 196 n.55. The firearms evidence presented at trial was only a small part of the record and the Government provided overwhelming evidence of Petitioner's guilt on the remaining counts of the indictment related to the FirstPlus takeover completely separate from the firearms evidence. In addition, the firearms evidence related to Scarfo[1] clearly would have been admissible at trial in any event in light of the fact that he was still prohibited from possessing or receiving firearms and that prohibition does not violate the Second Amendment. The admission of the firearms evidence at trial allegedly in violation of Petitioner's own Second Amendment rights was, therefore, incapable of producing a substantial and injurious effect upon the outcome of his trial, and must be considered harmless and no basis for relief in this habeas matter.[2] *See, e.g.*, *Fry v. Pliler*, 551 U.S. 112, 115-21 (2007) (claims of even a constitutional dimension will be considered harmless and provide no basis for

[1] The vast majority of the firearms discussed at trial were part of a cache on a yacht co-owned by Scarfo and Petitioner, and all but a few of the many firearms in the record would fall into this category.

[2] Petitioner also partially bases this claim on the fact that the jury was told at trial that he was a felon, a point to which he stipulated at trial and did not request to have considered only in a bifurcated trial for the firearms charges. Petitioner thus chose to have that information revealed to the jury when it considered the non-firearms counts at trial and cannot now complain that the Court agreed to the path he chose. The Court notes that Petitioner's criminal history was also relevant to the charge that he conspired to help Scarfo obstruct the terms of his supervised release, which required that he have no contact with felons such as Petitioner.

relief in a habeas proceeding unless the petitioner can show that the alleged error had a substantial and injurious effect on the outcome of his case); *Brecht v. Abrahamson*, 507 U.S. 619, 630-38 (1993). Given the overwhelming evidence of guilt on the remaining charges, even without any of the firearms evidence, the Court has no doubt that the result of Petitioner's trial would not have changed had any evidence related to the firearms charges not been admitted. Petitioner, therefore, cannot demonstrate that he was actually prejudiced by firearms-related evidence sufficient to support habeas relief in this matter. The firearms evidence thus did not unduly taint Petitioner's trial on the remaining counts, and he is not entitled to a new trial on those counts. Petitioner's spillover prejudice claim therefore fails as a matter of law and must be denied as such. Because Petitioner's spillover prejudice claim fails, he can show no basis to evade the bar on his Second Amendment claims under the concurrent sentence doctrine discussed above. Petitioner's motion to vacate sentence must therefore be denied.

### C. Certificate Of Appealability

Pursuant to 28 U.S.C. § 2253(c), the petitioner in a § 2255 proceeding may not appeal from the final order in that proceeding unless he makes "a substantial showing of the denial of a constitutional right." "A petitioner satisfies this standard by demonstrating that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003) (citing *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)). Because Petitioner's claims are either barred by the concurrent sentence doctrine or meritless for the reasons expressed above, Petitioner has failed to make a substantial showing of a denial of a constitutional right, and his motion is not adequate to receive encouragement to proceed further. This Court therefore denies Petitioner a certificate of appealability.

## IV. CONCLUSION

For the reasons set forth above, Petitioner's motion to vacate sentence (ECF No. 1) is **DENIED**, and Petitioner is **DENIED** a certificate of appealability. An appropriate order follows.

MICHAEL A. SHIPP
UNITED STATES DISTRICT JUDGE

Dated: October 29th, 2026